Thank you, Your Honor. May it please the court, Nathaniel Love for Theodore Washington, and I'd like to reserve 10 minutes for a buck. All right. Thank you. To start, this is a pre-AEDPA case. Questions of law, mixed questions of fact and law, are reviewed de novo. Factual determinations from the state courts are entitled to a presumption of correctness only to the extent they are fairly supported by the record. Now, the state does not know who shot Sterling Hill. The state has never argued that Washington shot anyone. The state does not have any evidence or even a theory of why this murder took place. Let me go one more thing you said about the pre-AEDPA law. As it relates to ineffective assistance to counsel, it seems to me that we still will give deference to the counsel as to his, if you will, his decisions as to what to put on, what not to put on. There is a deference as to that, as I understand it. There's no double deference because we don't owe any deference to the state law decision, correct? I think that's correct, Judge Smith, and I do think that's the same analysis that this court already did in Robinson's case, which presented substantially similar questions about the decisions that were made. Well, I just want to make sure that you agreed with me on that because we still have some deference to pay to counsel, just not to the state court's decision regarding what counsel did. Correct. All right. Single Strickland deference as opposed to double AEDPA deference under Strickland. Yes. So both Robinson and Mathers have gotten relief from the courts, but Washington was convicted and faces the death penalty for a murder. Well, that is sort of the elephant in the room. But that being said, just because, well, just because those occurred, the facts aren't the same as to each defendant. Correct, Your Honor, and I think that really is the question here today because with respect to Robinson, this court has already ruled that Robinson's death sentence could not stand. So the question is, what meaningful material difference is there in the record? Well, Robinson didn't go in the house. That's one. Well, Your Honor. Because Robinson was known to the Hills because of the relationship with the daughter, right? It's true that Robinson was known to the Hills, but it's also true that no identification was made of any of the defendants by either of the two witnesses in the home. So I do have more to say on that. I did want to say also with respect to Mathers, the Arizona Supreme Court found the record inadequate even to sustain Mathers' conviction. And also presented today is the question of whether there's any meaningful material difference in the record between Washington and Mathers that could support finding Washington guilty of murder. And that's exactly what troubled the original trial and sentencing judge, Judge Bradshaw, on post-conviction review. And I direct the court to pages 75 to 77 of the excerpts where Judge Bradshaw notes there is no greater evidence that places  However, it is the same judge that you're talking about that when he was confronted with the evidence you're about to present to us, said he wouldn't have changed his opinion at all. Well, respectfully, Your Honor, on these pages, 75 to 77, he's presented with the question of how Washington's conviction could be sustained when Mathers was acquitted. And his conclusion, he said, this court has a difficult task in finding any evidence linking Washington to the crime. The reason he didn't do anything is he believed that on post-conviction review, he was bound by certain statements that the Arizona Supreme Court had made in the Mathers decision. But he was very clear that he wanted counsel to be able to make a record so that some other court could accept review of this question. Because as to the facts, his conclusion, and he was the original judge the entire way through, was that there was no greater evidence against Washington. Well, but he could also inherently within that think, I don't think that the Arizona courts should have granted Mathers relief. And that bothers me as a matter of fairness that the evidence is still here against Washington. But, I mean, I could look at this and say, hey, I wouldn't have granted Mathers relief, but I'm bound by that. But it's not res judicata or issue preclusion as to your client when I look at the evidence. So I understand that point, Your Honor. But respectfully, I think if you look at the words that he used, and in particular I direct you to ER 76, this court has a difficult task in finding any evidence linking Washington to the crime. That's a statement in isolation only about Washington. I understand the comparative point, and it's possible that a different judge could have written a different opinion that simply said it seems unfair that this guy, who I think was guilty, get caught. But so why didn't he then grant insufficiency of the evidence on your client? So, first of all, his ruling at 77, he believes, he believed, and I don't think it's correct, but he believed at the time that the statements in the Arizona Supreme Court's decision, which essentially said there's not enough evidence against Mathers. If there were two people in the home, maybe it was Washington and Robinson. Those statements effectively put Washington in, you know, in the home. Well, Washington, one thing I can, I mean, it's very fact specific. And you have the issues about the red bandana, and you have things that are found in the area. You have Washington making the call. There are distinctions in terms of the evidence. And even though there wasn't a specific identification at trial, and witnesses sometimes backpedal as far as that goes, there was the young man that answered the door that fled the scene, the son. Yes. Thought, he first thought that he thought it was an African American that tried to get in. And I'm, am I correct that Mathers is white and Washington is black? You are correct, Your Honor. And actually that's a good place to start because the state argued at closing that the person LaShawn Hill saw at the door was Mathers, notwithstanding that LaShawn initially thought the person was black. And the state cited testimony that Mathers hung out with other black people and talked black and acted black. These are, this is testimony that was in the record. And so the state's position was that there was some partial identification of Mathers. That person introduced himself to LaShawn Hill as James, which is Mathers' first name. But the Arizona Supreme Court, in its decision acquitting Mathers, noted that testimony. But they also noted that LaShawn never actually identified Mathers, either in a lineup or at trial. And that's exactly the case with Washington. Okay. Did LaShawn identify Washington? No, LaShawn did not identify Washington. He was presented with a photo lineup and also with a live lineup and was unable to identify anyone. Wasn't there a description of one of the assailants that matched Washington? There was, but then he backpedaled a little bit. But when you consider identification, you have to consider all of what came in. I mean, what they said first, what they said second, and that's why you put in inconsistent statements. But a jury is allowed to infer from all of them. I think he said what they were going by in the car, there was something. Then he said, well, maybe it wasn't. Well, no, there were the two sons. There were the two sons, Robinson's sons. Counsel, it's Judge Gould. If I could interject for a moment. Before all your time is used up, I wanted to at least alert you as to the questions of most interest to me to make sure you address them. So I'm most interested in the questions of whether there was deficient performance by the lawyer at the penalty phase. And if so, whether there's prejudice from that. Yes, Your Honor, I'd be happy to. You have a COA on that issue, right? That's correct, Your Honor. And whereas I think you're seeking one on sufficiency of the evidence but don't yet have one, right? That's correct, Your Honor. So why don't we focus on your certified issue first. I'm most interested in that too. So that gets to people that are really interested in that. Well, I guess, I mean, I thought that's where you were going. So I'm glad that Judge Gould interrupted and said focus because I thought that's where you were going. But now you know what we're really worried about. So I think on the ineffective assistance of counsel claim, this Court's Robinson decision lays out the relevant requirements for a reasonable mitigation investigation, you know, tailored to the standards of conduct at the time. That includes consulting with qualified experts. That includes investigating mental health and drug use. And Washington's counsel, Clark, did not have any adequate reason to believe that further investigation would have been fruitless or harmful. And the analysis in this Court's Robinson decision is essentially the same, that the failure to do that was unreasonable. Those were the same errors that were made by Washington's sentencing counsel. I'm sorry, Robinson's trial counsel. But Robinson's counsel didn't call anyone, right? Yes, Your Honor, but these specific questions as to whether he... Okay, but it's not the same. If you want to say something's the same, because Washington's counsel called several people. That were relatives, like, what, the mother, a sibling... Correct, Your Honor. The ex-wife and a friend or whatever. That's called whether... How many witnesses did Washington's lawyer call? Three. I think it's only three, Your Honor. Three, okay. Am I wrong? Did Robinson call anyone? I will have to check, Your Honor. I'm not certain about that. But the Court's decision in Robinson was not that that is the failure that established that the counsel's investigation was inadequate. The Court specifically noted the failure to call a mental health expert to follow up on issues of mental health and drug use. Both of which were present, and that was established in post-conviction review. Both of those were issues that were present in Washington's case and were never investigated by his counsel. Suggesting that the mitigating evidence in this case is more impactful than the mitigating evidence that Robinson could have put on? I believe that it is, Your Honor, although I confess I don't have at hand the full scope of the evidence that Robinson's... Well, I mean, the problem comes, I guess, when we're talking about prejudice, and Judge Gould was anxious to get you on performance and prejudice. I'll move you right to prejudice. When I look at the differences, I mean, I say, first of all, the judge here says he wouldn't have changed anything if the evidence had been there. He said, I wouldn't change what I did one quit. Then I realize that's not the end of the inquiry, so I go on and I say, well, let's decide whether there's a reasonable probability. Well, it seems to me Robinson is your best case, because that's a similar type case, so I'm trying to say, what are the differences and what are the similarities? I understand the law to be applied, so we got here, there was no evidence that Robinson was ever in the home, no evidence that he ever performed the murder, so maybe there is then something to be said about that line, but it's offset by the fact he was never there. The next, there's no mitigating evidence in Robinson, none whatsoever, none presented, and there was mitigating evidence in this particular case, and when we talk about whether the lawyer was going out to get the evidence or not, this lawyer went out and looked for evidence, and Robinson didn't do anything. And that's why I ask you, I'm hesitant to say that the mitigating evidence in this case is as powerful as the mitigating evidence that Robinson wanted to present, so I'm trying to say, how could there be a prejudice? Well, Your Honor, on the prejudice point, the analysis that the trial court did was exactly the same with respect to both Robinson and Washington, and as this court observed in Robinson, there were two errors. First of all, a requirement of a nexus between mitigation evidence and the crime. That was an error made both with respect to Robinson, as this court already found, and it's the same analysis with respect to Washington. In addition, there's an improper weighing of that mitigation evidence against the aggravators. That's another error that was noted in the Robinson decision. And so, especially with respect to that aspect of the prejudice, I do want to jump to one of the other certified claims, which is... Oh, wait, we're not done here. So, I mean, essentially you've had 30 years to dig up what a proper investigation should have dug up, and what I can see that you're saying now, 30 years later, should have been presented that wasn't, is when he was 5 years old, someone put in a report that at school records, that 5 years old, that maybe he should be in the classes for a special education class. Dr. Roy was called at the PCR hearing in front of Judge Bradford, right? Bradshaw. Yeah. And the prosecution also put on saying, well, this is how we would have handled it, and they put on a rebuttal evidence, they called, that seemed to make Bradshaw have really quite a bit of doubt about the Rorschach test and things, that it was a speculative opinion that Roy would have had. And then I think you called someone from the institution that said that he was a model prisoner, right? Is that what came up? That's essentially what would, that the investigation that would be adequate should have turned up. Is that what you're saying? I think it's more extensive than... What else, then? Tell me what else. I'm going to have to grab, if you don't mind, I'm going to have to grab... Okay, do that. I mean, you have to be able to show that when you have 30 years and say, well, the lawyer should have done more, and there's 30 years and there's still no more. But that being said, I guess what I'm saying there in terms of if the judge heard all of that and said that still doesn't change my mind, that's kind of fairly powerful. Your Honor, I think that's why it's important to understand what the judge did in dismissing it and saying that it wouldn't change his mind. The one finding that was validated by two different doctors was a finding that Washington had symptoms of diffuse brain damage. And that was one of the issues that... Well, the prosecutor's witness, though, said that there's precedence and Walt Disney and other people could be said to have that. And so it's a very kind of a speculative type of thing. So I understand that, Your Honor. But the trial court's dismissal of that was in the context of him weighing that against aggravators and in the context of imposing a requirement that there's a nexus between that mitigation evidence and the crime, which is not correct. And I do want to make sure I get to these aggravators because, first of all, one of them is a certified claim, the cruel, heinous, and depraved aggravator. And on this record, that finding cannot be sustained. The aggravator breaks into two prongs. One of them is cruelty. The other one is heinousness and depravity. Starting with cruelty, there are no findings that can sustain this on this record. Well, why don't you tell me, then, not every robbery... Okay, this is not... This is a home invasion robbery. There's a young man that answers the door that flees. The two people are bound and put on the floor, and they're shot in the head. And there's evidence that the jury could... that apparently Mr. Hill didn't die, but Mrs. Hill did, but also that she, the husband, got shot first, and she would have had to hear that. That's correct, yes. I mean, do you think that... Do you don't think that a jury could think... This isn't... It's not like a... It's going into the 7-Eleven, and the guy at the 7-Eleven pulls a gun, and it goes awry. It's a home invasion. People are lying on their stomach. They're bound. There are two people in the house with a gun, one with a shotgun, another with a... some kind of pistol. The pistol's got earwax on it from telling the person, and, you know, and you have a shot and then another shot. Your Honor, I think there's several problems with that. First of all, it's not a problem with the description of the crime. Certainly, what you describe in terms of them being tied and shot is what happened. The problem is there is no evidence tying Washington to any of those acts, as is required by Arizona law. It's not the case that if, in the abstract, a murder is viewed as cruel or heinous or depraved, that then that aggravator can be applied to anyone who any of the defendants in the case. There has to be, on the part of Washington, a plan intended to or reasonably certain to cause suffering, and there is no evidence anywhere in the record that Washington... What was the discussion in the car about, what if this robbery goes wrong, and then there was some discussion about, hey, then just take care of them? So the words that the state has been relying on comes from the testimony of Major Ogden, who related that what Robinson said is, if things get rough, shoot them. That is a statement about what was supposedly going to be a planned drug robbery, and the idea being that they're going to go rob drug dealers of their drugs, who are likely to be armed, and if things in confrontation with drug dealers get rough, shoot them. The problem is, these people were not drug dealers. That was a... If that story happened, it's a false story to get other people to come along with Robinson. Well, that's your narrative, but the jury can have a different... They can make different inferences. This is not a jury question, Your Honor. This aggravator was applied by the judge. This was judge sentencing. This is before Ring v. Arizona. Washington did not get the benefit of that case. But the jury convicted, right? But the application of these aggravators, there are specific requirements in Arizona law, in the Carlson case, that are not met. They cannot be met on this record, because the state has conceded that Washington is not the shooter. They don't have evidence that he was in the room at the time that the shooting took place. They don't know why the Hills were shot. On the heinousness and depraved prong, there's factors, things like relishing the killing, gratuitous violence, mutilation. The state concedes none of these factors are present. They focus on senselessness and helplessness. But under Arizona law, the sentencing court is supposed to focus on aspects of the killing that were within Washington's knowledge or control. There is no evidence anywhere in the record that Washington had any knowledge or control over whoever shot Sterling Hill. There's simply nothing there. So it's not a matter of whether I disagree that the records can support his conviction, as we've laid out in the briefs. But notwithstanding that, there are specific requirements under Arizona law for these aggravators that can't be met because the state doesn't know who shot Sterling Hill and doesn't know why. There are essentially mens rea elements to these aggravators. Somebody has to have a plan. They have to have knowledge or control over some other assailant who's doing the shooting. And there isn't any evidence that Washington has any of those things. What were they tied up with? Your Honor, I'm not certain what they were tied up with. But the state has conceded that they don't have any evidence that Washington was the person who tied them up. So to the extent that their helpless state is a factor, there's nothing in the record that they've conceded. Do they say that it wasn't the two people in there? I mean, the state's not saying that Washington wasn't inside. The state's position is that they believe that the person that Ralph Hill saw who had a bandana and was going through drawers was Washington. Of course, in three lineups, Mr. Hill was unable to identify Washington. That included a live lineup where everybody had to come step forward and say certain words that LaShawn Hill and Mr. Hill heard in the home. He was unable to identify them. That's a much more stark failure to identify than there was with Mathers. But even if you thought that that was correct, the testimony was only at some point that person was in the bedroom. Ralph was shot first. The testimony indicates that those things were separated in time. So whether that person who went through drawers was still in the room, there's nothing in the record that suggests that he was. He may well have been in a different room in the house looking for something. And then Sterling was shot after Ralph. Ralph was knocked unconscious. We do not know how long that time was. We have no idea who was in the room when that happened. So there is nothing in the record at all to sustain either of these aggravators. The pecuniary gain aggravator requires that pecuniary gain is a motive, cause, or impetus for the murder, that pecuniary gain was the reason the trigger was pulled. They don't know who pulled the trigger or why. And that aggravator can't apply. And there are not adequate findings to sustain the death penalty under Edmund and Tyson either, because Washington can't be a major participant who exhibited reckless indifference to human life if all the state has is they think he was in the house. Being in the house. But just a minute. If we're talking about the pecuniary gain aggravator, we have in the record these particular situations. Your client was advised the purpose of the trip. The assailants entered the residence with weapons. Ralph Hill says the assailants repeatedly demanded dope and money. Your client ram-sapped the room while Ralph Hill was being held at gunpoint. Items of value were taken from the house. They were found discarded in the near field. Why isn't that enough? So it's not enough, Your Honor. First of all. Well, first of all, let me tell you that we've got an arbitrary and capricious standard of review here. And the judge felt this was enough. And I guess I'm trying to figure out if that's the evidence I have to look at and I have an arbitrary and capricious review standard, why I could say that that's arbitrary and capricious. I think the simple answer to that is to look at two cases. The state versus Hyde, which is an Arizona Supreme Court case, and this court's decision in LeGrand. I did look at Hyde. So the point is the goal of pecuniary gain has to cause the murder. The state doesn't know why someone pulled the trigger. The purpose of the trip was either to take out a drug dealer and get his dope and money. That was the purpose. But these people weren't drug dealers and they had no drugs. That story was a lie, and to the extent it was told, and it was evident that it was false as soon as whoever the intruders were came into the house. These were two elderly people in a normal home that had no drugs or money of any kind. So the point is, the statement. The point is we're arguing on an arbitrary and capricious standard that the facts the judge found to be essential to his determination are not valid and the facts you want to suggest, which might be opposite evidence, is enough to overturn an arbitrary and capricious determination? Respectfully, Your Honor, no. I'm not trying to suggest alternative facts. What I'm pointing to is that the state doesn't know what the motive or cause of the murder was. This aggravator requires that pecuniary gain is the motivation or cause or impetus of the murder, and this has to be a finding with respect to Washington. So even if you think the evidence supports the conclusion that Washington was involved in a robbery of the home, someone pulled the trigger. The state concedes it was not Washington, but they don't know why it happened. And without that evidence, you can't apply this aggravator. And if I could, I'd like to reserve the remainder of my time. Let me find out. I'll give you 10 minutes for rebuttal, so I'm going to give you, but I want to make sure. Judge Gould, do you want to – are your questions answered on the prejudice or would you like – I'm going to give him 10 minutes for rebuttal any way we look at it, so please. I don't think counsel's argument fully addressed my interest in the prejudice problem, but you can handle the rebuttal. Thank you, Your Honor. Okay, I'll give you 10 minutes for rebuttal. Thank you, Your Honor. Okay. May it please the Court. My name is Laura Chason, and I represent the respondents in this matter. Okay, so since we have – the picture's got a little bit of a frame here, so I think maybe we can focus that. And the appellant has talked a lot about what your theory at trial was, that Mr. Robinson was the mastermind, Mr. Mathers pulled the trigger, and Mr. Washington, though likewise culpable, was arguably the least culpable of the three men. One of those men had his conviction overturned and the other's sentence was vacated. So that's the elephant in the room. Do you want to just go right there? Sure, thank you, Your Honor. First of all, how does that implicate Mr. Washington's sentence? Not at all, because the evidence against Mr. Washington is different and greater than the evidence against Robinson and Mathers was. Basically, it is Ralph Hill's description of the man who invaded his home matched Washington's description that night. We know that Washington left California with Robinson and Mathers and that Robinson was captured leaving the Hills residence after the murder. So we know that Robinson was there with his car. Well, I guess what I'm asking you, does your theory of the case even matter at this point or are we just looking at the evidence that the jury heard and the evidence that the sentencing judge heard? I don't believe the theory does matter because the evidence shows at least that Washington was there. It's sufficient. Who shot the Hills, we don't know. We do know Washington ransacked the home, establishing the pecuniary gang circumstance as to Washington. Well, you don't really know anything. You just assess it. I mean, you put it all in front of the jury. You have a theory of it. I mean, you weren't there. The prosecutor's not there. I mean, we have to just look at the evidence and you pull together what your theory is and it may or may not have been correct, but what's the evidence? Well, the evidence is that Ralph Hill saw a man matching Washington's description that night enter his home and ransacking his bedroom while he was tied up on, he and his wife were tied up on the floor and someone else was holding a gun to them. So we do know that this man who matched Washington's description was in the home, was armed because Mr. Hill testified that both men were armed and we know that the man matching Washington's description was ransacking looking for valuables. And so that establishes Washington's participation. But he can't later identify Washington, right? That's right. That identification kind of goes downhill. That's right. What's the evidence regarding a bandana? The bandana is relevant because Mr. Washington was seen wearing a bandana when he left California with Robinson and Mathers. Now there was, admittedly, the sons went back and forth as to whether he was wearing the bandana. It was pointed out by the prosecutor when he elicited the testimony that the sons had told police shortly after the murders that Mr. Washington was wearing the bandana. While at trial they went back and forth as to whether he was. A friend of Washington's and Robinson's, Mr. Joe Dixon, also testified that Washington commonly wore a red bandana. And so that's the red bandana. But what's found in the area of the homicide? Excuse me? Okay, so Mr. Robinson's found around the house. Mr. Washington is not. But then there's the red bandana and a shotgun that forensically matches to be the murder weapon, and there's a note, something about, say, Eric Robinson. Right. Mr. Robinson, as you noted, was picked up in his car leaving the scene. In the car was a red bandana that probably had Mathers' hair on it. That red bandana is a red herring. The state never suggested that that was the bandana that Washington wore. Washington was wearing his in the house, and it's not reasonable to believe that he would have thrown it in the car as he fled, likely Robinson took off. Counsel, Judge Gould, if I can interject, please. Before you use up all your time on sufficiency of the evidence, which was not certified, I'd like you to address the certified issue of whether there was ineffective assistance of counsel at the penalty phase. And I may be like a sled pulled by only one horse on this, but that's the issue that I at least would like to hear about. Why didn't the lawyer develop evidence of the drug use of Brian in this case? So Mr. Washington's girlfriend, Barbara Bryant, not testified, but told counsel that Washington had a cocaine problem. So why didn't the lawyer, if the lawyer is trying to keep Washington out of the death penalty, why didn't the lawyer present evidence of the drug addiction or drug problem in mitigation? It's unclear why he didn't further investigate. It's not clear. Do you acknowledge that apart from whether there's prejudice, there's deficient lawyer performance on that? No, I don't. Because Mr. Clark, Washington's counsel, did talk to Washington very extensively and to Washington's brother and mother as well as the girlfriend. Apparently the girlfriend mentioned to Clark that Washington had a cocaine problem. Mr. Clark had no indication from any other source that there was such a problem. While it's unclear whether he investigated that specifically. What investigation did Washington or did the lawyer do about the scope of the drug problem? It appears that the investigation probably just entailed. Was nil, right? Pardon? It appears the investigation was nil. Well, other than speaking to his family, who arguably would know, and speaking to Washington, Washington never indicated that he had been using cocaine. He indicated he had been drinking. So I think it was reasonable for counsel not to investigate. But as you say, even if the performance was deficient, there was no prejudice. The PCR court heard of that. By the way, I'm not saying there's no prejudice. That's what I want you to address. But also I don't quite understand why there isn't deficient performance in regard to bringing out whether Washington had any kind of brain injury or deficiency from beatings or falls when he was a kid. Okay. Was there any evaluation of that? Yeah. Mr. Clark testified at the PCR hearing that he questioned Washington and his mother and brother extensively, specifically asking whether there was any abuse in the family. No one indicated any abuse. He asked about medical issues. No one indicated any kind of medical issues. Was there any psychological evaluation? No psychological evaluation. No, there was not. And he testified, Mr. Clark testified that the reason he didn't was because he had spent a lot of time with Mr. Clark was because no psychological evaluation was required. And so he had no indication that further investigation was needed. And I think, as the court has pointed out, Mr. Clark did present three witnesses at the mitigation hearing. None of the other attorneys presented anything. And this court has held that Robinson's counsel was ineffective and has reprinted the argument that Robinson's counsel made. If you look at the argument that Washington's counsel made, he specifically outlined the mitigation that was the factors that he was presenting. He presented that Washington was a minor participant, that he was intoxicated, that his age was mitigating, and he also asserted that he was a single parent and very loving to his son. So he did present mitigation. And Mr. Washington's mother and brother or, I'm sorry, brother and friend also testified that Washington was gullible and a follower. So there was mitigation presented. Even if counsel was deficient for not investigating further by getting a psychological evaluation or investigating Mr. Washington's drug use or mental impairments, which he had no inkling of and no reason to believe there were any, there was no prejudice on the record. Was there testimony that on the school issue, it didn't, did his mother testify that he dropped out of school at 17 or did someone? Yes, his mother testified. I think it was 10th or 11th grade that he dropped out, yeah. So he wasn't, it was known to Judge Bradshaw that he was not well-educated or that he did not do well in school. Right. And actually, Dr. Roy in the PCR hearing testified that the reason Mr. Washington had trouble in school was because he was getting into trouble and not because of any, or that at least contributed to the reasons he had trouble in school. So even that is not exceedingly mitigating in light of Dr. Roy's testimony. Counsel, I have the impression that the judge in sentencing thought there had to be some nexus between the mitigation evidence and the crime. But hasn't the Supreme Court said there is no such nexus requirement in a case like this? There's no, a fact finder or a sentencer may not consider causal nexus as, may not consider the lack of causal nexus as a reason to not consider any mitigation. But they may consider it in giving weight to the mitigation. And in that respect, respectfully, the Robinson court, this court in Robinson was, made an error in stating that the court was not allowed to consider the causal nexus in weighing the mitigation. That is certainly a correct application of the causal nexus. So, so how do we, how do we know that the prior fact was just giving less weight to this mitigation evidence if it was never offered? And I can understand if the mitigation evidence was offered and it was admissible under the theory there didn't have to be a nexus that the decision maker would have a lot of freedom to give it what weight. They thought appropriate. But when it's not offered, when there's no investigation of it, like here, when it's not offered in evidence, how can we characterize this as just a problem of weight? Well, if I'm not sure I'm understanding correctly, but the PCR court did, which was the same court that sentenced Mr. Washington, did hear the evidence that Washington was claiming should have been presented at trial. So the evidence was presented and the PCR court, this court sitting in post-conviction as opposed to sentencing, stated that it was not sufficiently mitigating. The additional evidence was not sufficiently mitigating because it didn't connect to the crime. That does not mean the court refused to consider it. He did consider it. But, and if you look at the district court's ruling on this claim too, the district court clearly presented, clearly stated that it was, that the evidence would have been given minimal weight and not no weight because of the lack of a causal nexus. And so, so we know because the PCR court said it, it wasn't enough to make a difference. And the PCR court considered all of the mitigation that was proffered and, and held that it would have made no difference. And what if it was just Dr. Roy? And tell me what you think the significance is of that. The prosecutor did put on someone else in front of Bradshaw. Does that strengthen or weaken your argument? How does that? You mean the state's expert? Right. Because, you know, let's say if it was just they said, Dr. Roy, and you hadn't rebutted that in front of Judge Bradshaw, would they have a better argument that Dr. Roy could have made a difference? They may, because the, the PCR court did, did state or did implicitly find that Dr. McCullers was more credible than Dr. Roy. So that might have been a better argument. I think, I think even crediting Dr. Roy's diagnosis of diffuse brain damage. I don't have all of the diagnoses here, but, but he, he, even Dr. Roy testified that, that none of this affected Mr. Washington's ability to conform his conduct to the law or understand what he was doing was unlawful. What did he say about his intelligence on retardation? So he, he testified that he had measured Mr. Washington's IQ at 96, which is basically average intelligence. So, and that weighed against the finding in when Mr. Washington was five years old that he should be placed in a, in a special education class. Even Dr. Roy admitted that there was no basis for that and nothing in the record showed, nothing in the school record showed an IQ test that would support a, a mentally retarded or intellectual disability diagnosis. What would be your response on the, the, the correctional officer that said he was a model prisoner? What was put forth in front of the original sent, when the, at the original penalty phase about his potential for rehabilitation? My understanding is there, Judge Bradshaw knew that he had been incarcerated, right? Right. I believe so, yes. And what was the testimony regarding after he got out, then he got custody of his son or something and became a better father and, and all of that? Right, right. They, they, the, Mr. Clark, Washington's counsel emphasized that, that everything that Washington had to do to obtain custody, go to court and, and go through proceedings. The, I'm sorry, I lost my train of thought there. There was no evidence specifically put before the judge about, at least not in the transcripts about Mr. Washington's conduct as a prisoner. But in the PCR ruling, the, the court stated that it was aware when it sentenced Mr. Washington that he was a good and even model prisoner. So, so the court was aware that, that Mr. Washington was a good inmate. But, but that kind of evidence is not weighty. We expect that people who are incarcerated will follow the rules and, and be good inmates. So that's not considered particularly weighty. So just so that I understand your position, do you find any under, we're, we're pre-EDPA, so we just have the normal Strickland analysis as opposed to the double deference. Is, do you find any of counsel's representation deficient on prong one? Do I, do I believe that the counsel was deficient on any of the? Yes, what is your position? Yes, excuse me. No, because I think at the time, now this was 1987 and Strickland had been out for three years. So, so it was early in the game. We didn't have a lot of case law explaining and, and refining Strickland like we do now. At the time, Strickland required that counsel do an investigation, perform an investigation, or, or determine that one was not required after speaking to the defendant. And counsel testified that he spoke not only to Washington, but also to family members. No one, no one identified any kind of abuse. Washington's brother testified they were a close and loving family. There was no, no abuse. No one suggested any kind of mental impairments. No one talked about any, any head injuries. No one talked about alcohol or drug abuse. There might have been an inkling from the girlfriend that he had a cocaine problem. We're not sure what was said there. But you need to presume that the counsel took that into account and, and performed reasonably in that respect. So, so no, I don't think, I don't believe that counsel was deficient. So how did counsel perform reasonably in that respect? What did counsel do? On the issue of the cocaine? The record is, I don't recall Mr. Clark testifying to any further investigation he did on that. He did, there was testimony that Mr. Washington told Mr. Clark that he was intoxicated by alcohol on the night of the crime. But he never said anything about cocaine. That is where, that's where the evidence would really become the most mitigating, is if he was intoxicated or under the influence of cocaine during the crime. And even Mr. Washington. I think I know your answer to this question. But do you really think that, that Clark was trying to avoid the death penalty? I do. For Washington? I do. He was, if you look at the closing arguments in the guilt and penalty phases, his was the most compelling. The other, the other attorneys sort of tagged on to Mr. Clark's arguments in, in, in the closing phase of the, excuse me, in the closing at the sentencing phase. You know, as I said, he went through all of the relevant mitigation. There, admittedly, there wasn't much to work with, but he did work with what he had. He asserted that Washington was a single parent, had gone through and gotten custody of his son. His, he asserted his age as a, as a mitigating factor and that he was, that Washington was intoxicated and a minor participant. Isn't it correct that the fact there wasn't much to work with was a consequence of his lack of investigation? No, because he still, even after investigating at the PCR, doing further investigation at the PCR stage, they still didn't present significant mitigation that would have militated against the death penalty. I think it was a, just a fact of Washington's life that there was just nothing mitigating. He was 27 years old. Any abuse that he endured as a child was, would not have been considered mitigating, significantly mitigating, because he was 27 years old and, and the courts presume that when you reach that age, you can overcome that difficult childhood. That would be true unless, unless he had some kind of brain deficiency that would affect his impulse control. It could be. I don't believe any expert testified about any difficulty he had with impulse control. There was testimony that he was a follower and was gullible, and I think that's what counsel now put forth as the reason he was there. He was only there because he was following the others, but there was nothing that I recall about impulse control. As I said, Dr. Roy diagnosed only diffuse brain damage, and no, I don't believe there was any neurological impairments found. So what do we, all right, so what, let's get our arms around what has been developed in 30 years. So what if, let's, what is the evidence that's been developed in 30 years, and then address prejudice on that? To my knowledge, nothing has been. What's come up about the cocaine? Well, whatever was, only what was presented at the PCR hearing. Specifically with the cocaine, I don't recall the ages that he said he started using it. He did apparently have a big alcohol problem that he was given alcohol as a young child and was a functional alcoholic by the age of 14. So that's, and I'm sorry, I just don't recall specifically with regard to cocaine. This is important. I understand that. If we're going to talk about prejudice. I just recall most of the evidence had to do with an alcohol problem and not a cocaine problem, and maybe Mr. Love can correct that. I just don't recall that there was very much testimony about the cocaine. So anything else that was developed, as far as I can tell, nothing that wasn't presented at the PCR hearing has been presented since then. All right, well, what's the most analogous case for us to consider in deciding whether Mr. Washington has met both prongs of Strickland? What's the most analogous case that you have? I'm not sure what that would be. I think you can compare it to Robinson's case and see that Robinson's counsel did much less than Mr. Clark did, and I think Robinson also had significantly more mitigation. There was some sexual abuse, I believe, and other things going on with Mr. Robinson. That tells us what's not enough, but it doesn't tell us what is enough. Well, Robinson's wasn't enough. Okay, but do you have a case out there that is like this case that says it was enough? It was enough to show counsel that it wasn't prejudicial. What's the best case on prejudice? I'm sorry, Your Honor, I don't have a case that I can just identify for you right now. Counsel for Petitioner didn't cite any cases on prejudice either. He just said it's prejudice, but there's cases out there like Williams, Wiggins, Rompilla. There's cases out there that I'm just wondering. I think Porter, too, there's another case. So I would think that each of you would be telling you what's the case that works, that says either it wasn't prejudice or it was prejudice. But neither of you have anything there. Excuse me. I apologize. I don't have that ready to give you, but I think it's clear that the mitigation, the additional mitigation, that Mr. Washington presented to the PCR court was very minimally mitigating. None of it was connected to the crime. Well, how much weight do we give what Bradshaw said? Well, I think, obviously, you know, there's no deference to his legal rulings on prejudice. How much weight do we give it on prejudice? He's the same. I found out there there are cases where people have said it's not fair to have the same judge do the PCR as the judge that did the actual sentencing. And I think that there's case law out there that says, you know, au contraire, that's the best person to look at it because they've sat through the whole trial, they know what the evidence is, they know why they sentenced the person. So there seems to be. But then on the other hand, I mean, one of the things that's sort of interested in the Williams case, which they said there was prejudice, I think the procedural part of Williams was that there was the same judge on the PCR as on the trial, and that judge had said there was prejudice, and then the higher court said there was no prejudice, and then the Supreme Court said, no, we're going to go with what the PCR judge said. Right. And, of course, Arizona takes the view that it is beneficial to have the trial court judge preside over the PCR. Whenever possible. Because they are familiar with the facts and can more, I think, accurately assess the additional evidence and how it would have impacted the trial. And I'm sorry, I'm not sure if I've addressed what you wanted me to address with that. Judge Gould, did you have additional questions? No, I don't have additional questions. No, thanks. We don't appear to have any additional questions, so if you want to wrap up, you can. Well, I would just appreciate you giving us the time to talk about this, and I would just ask that you affirm the district court's ruling and deny relief to Mr. Washington. Thank you. Thank you. If I could, I'd like to begin with some of these issues on ineffective assistance of counsel. Well, I think maybe you can go right in on the prejudice again, because we've been hovering there in terms of I gave some. You didn't really cite any cases that supported your argument on prejudice, and I've come. What is your best case? So, Your Honor, at our red brief at 55, we've cited Wiggins. We've cited Bean v. Calderon, which particularly goes to the abusive upbringing that Washington had and the relevance of that evidence. Also, Summerline v. Shryo and Carroll v. Calderon, which are cited in our brief. Well, okay, but Wiggins, all right. Mr. Washington got hit with a switch, right, and a belt. Yes, Your Honor, he was beaten by the child. And Wiggins' alcoholic mother frequently left him and his siblings home alone for days without food, forcing them to beg for food and to eat paint chips and garbage. The mother beat Wiggins and his siblings and had sex with men while her children slept in the same room. On one occasion, the mother forced Wiggins' hand against a hot stove burner, resulting in hospitalization. After being removed from his mother's custody and placed in foster care, Wiggins was physically abused and repeatedly molested and raped by one foster father and gang raped on multiple occasions by a foster mother's son. He ran away from the foster home and began living on the streets. That doesn't seem very close to being hit with a switch back in the 60s or whatever, or 70s. Your Honor, I think the test, pages 49 to 50 of our brief is where we cite the evidence about his upbringing. It certainly doesn't have the extreme nature of Wiggins, but it does involve him being beaten between the ages of 5 and 12. His siblings were also beaten. There was affidavits that were offered from other siblings about that abuse corroborating that story of the abuse. Just using the words beating specifically, give me what the facts were. At ER 74, his mother whipped him twice a day, raising welts and leaving it difficult for him to move. ER 595, one of the siblings recalled having bruises all over her body and black eyes. At ER 593, another sister recalls the mother beating them with a belt and electrical cord. I'd also like to go to, on prejudice. Is that as bad as what I read on Wiggins? Your Honor, I certainly wouldn't say it's as bad as what it was. Well, thank you. If you said it was as bad, I was going to say that's... No, Your Honor, but it certainly is a severe story of child abuse. And the nature of that testimony is relevant in mitigation, and it's prejudicial that it wasn't offered. Additionally, with respect to... I guess the reason, I mean, I'm listening to Judge Callahan go after you, but what I tried to do is I tried to look at the cases of Williams, Wiggins, Rompilla, Porter. I tried to look at these cases to try to compare them, if you will, on a prejudice standard to what you're suggesting is the evidence that would have been presented here to try to see if there's something we should do for your client. And that's why I think you need to answer. I mean, I felt like you haven't really answered what Judge Callahan was really talking about. It doesn't seem to me that one can really say that your client was subjected to the same stuff that Williams was subjected to. If not subjected to it, and if it's not that serious, then I have to say, well, really, would it meet then the Williams standard? Would it really get there? Because I'm trying to now compare. I understand, Your Honor. The evidence here is not simply evidence of child abuse and a difficult upbringing. It is that it is combined with the evidence of head injuries. It is combined with the findings of diffuse brain damage that was contributed to by the head injuries. There's alcohol and drug abuse far more extensive than what the State mentioned. In particular, LSD, PCP, crack cocaine, and other drugs, freebasing cocaine by 1987, that's in page 52 of our brief along with a string of the sites to the excerpt of record documenting that drug abuse. There's extensive drug and alcohol abuse. There's the beatings as a child. There are the head injuries. And then you couple that with when you're comparing to Robinson, all of the evidence suggests that in these events, Robinson was the instigator. There is no suggestion that Washington was the shooter. And to the extent that you have a question about whether defendants were present or not present at the scene, Robinson was arrested fleeing from the scene in the car. A footprint matching Robinson was found outside the house. There's no evidence establishing one way or another whether Robinson actually went in. But, again, we don't have a confirmed identification of Washington either. The evidence does suggest that Robinson was immediately outside the home supervising over the scene. So balancing this evidence with any suggestion that Washington was really culpable in this crime would have had a significant impact. And I want to make one more point. The standard of practice in 1987, counsel referenced sort of being the early days of Strickland. It's clear that the standard of practice in 1987 required a psychiatric evaluation. There was expert testimony in the PCR hearing on that. It's summarized in our gray brief on pages 27 to 28. Okay, but is there a case that says you have to do it in every case? Are you saying that? Certainly in a case where there was absolutely no suggestion of any of these problems, but I think the state has conceded that there was a suggestion in particular of cocaine abuse. So what's your best case on that? That at the time that- Well, Your Honor, I- Are you backing away from- I heard you say at first that I thought you were arguing that on every case at that time, counsel would be ineffective if he didn't order a psychological, and I haven't found that case. Well, first of all, I believe that's what this Court said in Robinson, in the Robinson decision, which is obviously having- it's exactly the same time is this inquiry. So pages 1108 to 1109 of this Court's Robinson decision summarizes all the nature- forms of investigation that are fundamental to preparing virtually every capital sentencing proceeding, and the counsel has a duty to investigate and present mitigating evidence of mental impairment, and it says you can typically begin your investigation by interviewing the defendant. The investigation cannot end there, and the investigation- the minimal investigation that was done revealed these issues, and the counsel did not pursue them any further. Counsel, Judge Gould, if I could interject. At some point, the sentencing judge made a comment that if he'd heard the mitigation evidence, it wouldn't make a difference, right? Was he talking about all the mitigation evidence, or just the evidence of the time that Washington had in prison? Your Honor, I confess I'm not certain- without looking at the entire context of that statement, I'm not sure whether he was referring to the full scope of the evidence or not, but I would come back to the problem of deferring to that kind of statement is that they're the two same legal errors made by the same judge in the same PCR hearing. This was a combined PCR hearing that this court has already found were legally erroneous. So those kind of statements are, you know, that he wouldn't have changed his mind, are colored with the fact that he had two legal errors in deciding whether or not this- how this evidence would be weighed. I do want to come back to a couple of the points that the state began with concerning the evidence, because I think there are some issues with the record and the way the state represented it. With respect to- Counsel, in connection with your argument on that, could you let me know are there any cases that specifically address whether on a no prejudice, finding the court is entitled to rely on no prejudice from evidence that was never submitted, like the possible evidence, or if it only refers to based on what was submitted there was- and admitted there was no prejudice? I confess to your honored hand, I don't have a case that answers that question. So I'm not certain. So counsel made the statement that there was testimony that both intruders were armed. That is not correct. If you look at this testimony of Ralph Hill concerning the person going through drawers in the room, there's no testimony that that person is armed. There was a reference earlier in questioning to both a shotgun and a pistol, and a pistol being screwed into someone's ear. The state has taken the position that the person screwing the gun in the ear was Mathers. The state has always taken the position that the person who ultimately shot with the shotgun was Mathers. There is no evidence in the record that Washington was armed at any point. I also want to touch on the bandana, which came up a couple of times. I think it is telling- I don't know whether there's no evidence. I thought Ralph Hill said there were two armed men who invited his home, and the description of one of the assailants is the one that described your client. If we're to believe Ralph Hill. Now, I understand you may not believe what Ralph Hill said, but he said two armed men invaded his home, and the description of one of them was your client. Well, Your Honor, I- A young man wearing a red bandana. Had a mustache and long sideburns. And it wasn't Robinson because Ralph knew him. Couldn't have been Mathers because he was white. There's only one that it could have been. Well, Your Honor, I think- That man had a gun and was going through the closet and the drawers while the other man held a gun on Ralph and his wife. I think you have to look at Ralph Hill's testimony. What you're reading from, Your Honor, is something that the state court said, and if you look at Ralph Hill's testimony, that is not what he said. He did not say that the person going through drawers had a gun. That's actually quite clear from his testimony. There's nothing that actually puts a gun in that person's hand. You say there's nothing in Ralph Hill's testimony that says two armed men came in his house, invaded his home with a gun. You're saying that because I looked at that. That's exactly what he said. The testimony about what was happening in the bedroom is more clear than anything initially because when someone came into the house, when he woke up and he heard noise, he went out of the bedroom and it was dark and he saw shapes and he couldn't be certain how many people he saw or who they were. He couldn't identify them. His only testimony that made an effort to identify anybody and describe what those people were doing is his testimony in the bedroom. And that testimony... I understand your argument now. I have one additional point I wanted to respond to. Let me make sure that my colleagues don't have any additional questions. All right. I've already given you extra time, so I'll give you one more minute to wrap up. Okay? Because you're already... I understand, Your Honor. ...over time. I would just point out, as the original trial judge, Judge Bradshaw, concluded on PCR, there is no greater evidence against Washington than there is against Mathers. Even if you were not inclined to fine for us on the sufficiency of the evidence claim, that's the same evidence that goes to these aggravators, and it is not sufficient to sustain the aggravators or meet those specific legal requirements that are laid out in Arizona law. And I think that loops back to this issue about the prejudice that was suffered due to the ineffective assistance of counsel because those aggravators were weighed against this mitigation evidence. Washington is the least culpable of any of these defendants. The state has never argued that he killed anyone. The state has no idea why Sterling Hill was shot. Washington cannot be sentenced to death for a murder... Are we sure she was shot, though? Yes, Your Honor. Okay. But the state does not know who committed that crime and does not know why that shooting took place. And based on that, the aggravators and Edmund and Tyson simply can't be satisfied. All right. Thank you, Your Honor. Thank you both for your argument. This matter will stand...
judges: Gould, Callahan, N.R. Smith